LOCAL LODGE 2144, BROTHERHOOD OF RAILWAY, AIRLINE AND STEAMSHIP CLERKS, FREIGHT HANDLERS, EXPRESS AND STATION EMPLOYEES and James H. Thill, Plaintiffs,

v.

RAILWAY EXPRESS AGENCY, INC., a/k/a R. E. A. Express, Defendant.

Civ. No. 1969–53.

United States District Court
W. D. New York.

Feb. 25, 1969.

John T. Collins, Buffalo, N. Y., for plaintiffs.

Hodgson, Russ, Andrews, Woods & Goodyear, Buffalo, N. Y. (Hugh McM. Russ and H. Kenneth Schroeder, Jr., Buffalo, N. Y., of counsel), and Robert E. Johnson, New York City, for defendant.

CURTIN, District Judge.

On February 11, 1969, plaintiffs commenced an action in this court by an order to show cause seeking to enjoin the defendant from moving certain freight, baggage, and merchandise work from the Buffalo, New York, terminal to Albany, New York. Plaintiffs further sought the court to direct the defendant to comply with Rule 12 of an agreement between the defendant and the plaintiff if the court found. such compliance necessary. A temporary restraining order was granted at that time to expire at 10 A.M. on the 13th of February, 1969. On February 13, application to extend the temporary restraining order was denied.

On February 14, 18, and 19, a hearing was conducted in this court and the arguments of counsel considered. The following constitute this court's findings of fact and conclusions of law.

The dispute between the plaintiff and defendant involves the moving of hub traffic from Buffalo, New York, to Al-

bany, New York, by the defendant. A hub city in industry jargon describes a central transfer point in a certain region through which all freight passes before reaching its final destination point within that region. Hub traffic is traffic not originating in or delivered by the hub city pick-up and delivery service. The hub concept was instituted in early 1968, but was, in essence, nothing more than the gateway system which had been established many years before.

Before February 15, 1969, the effective date of the change, the Buffalo terminal contained four departments: Air Express, Import-Export, City Pick-up and Delivery, and the Hub Operation. Under the plan moving the hub traffic to Albany, 140 regular positions are abolished and 30 more are affected adversely. This will leave about 115 positions in Buffalo to service the remaining three departments.

The plan to move the hub traffic from Buffalo to Albany appears to have been contemplated by the defendant several months before the final decision to move was made. The defendant's business has declined sharply in the last ten years. Illustrative of this decline is that in 1959 there was a total of 70,-000,000 air and surface shipments as compared to 45,500,000 in 1968. This decline in business has been most drastic since 1966, when the total air and surface shipments numbered 62,700,000. This decline in business is attributable to a number of factors. Today, the railroads run very few Railway Express cars nationally and, in the northeast region, no such cars are in operation. In 1966, when the rates and rules for its shipments were changed, the parcel post system became a strong competitor of the defendant. There has also been competition from the motor transport industry. Because of this, it is estimated that the shipment volume of the defendant will continue to decline in the near future.

The number of defendant's employees has shown a steady decline nationwide. In December, 1966, there were approximately 32,500 employees; in December, 1968 about 25,000. It is further estimated that this number will continue to drop through 1969.

Financially, the defendant has had net operating losses since 1967. On June 30, 1967, this loss was computed to be five million dollars; on June 30, 1968, 16.9 million dollars; and December, 1968, 17.2 million dollars. This December, 1968 figure represents the net operating loss for the six months prior to that date. The projected loss as of June, 1969 is estimated to be about 25 million dollars.

The stock of the defendant is owned by 55 railroad companies. In 1967, an attempt was made to sell the corporation, but it was not successful. The direction of the company was then turned over to three trustees by the stockholder railroads. The trustees have complete authority to run the defendant company and the court understands that this authority is limited only to the extent that they may not sell the company.

For some time it had been estimated that the defendant's largest business losses were occurring in the northeast region. On January 1, 1967, through certain accounting procedures, the defendant was able to confirm this estimate. It was established that approximately 85% of the defendant's losses was attributable to the northeast region.

Buffalo was one of several hub cities in the northeast region. The Buffalo terminal on Curtiss Street near the old New York Central Terminal is rented from the Pennsylvania Central Railroad Corporation for $109,000 per year. The defendant's terminal is old and poorly designed for modern traffic. Much of its space is not used because it is unsuitable for the demands of piggyback, flexivan or motor truck traffic. It can handle about 800 pieces an hour. At present, the defendant is negotiating a lease for a different facility in Buffalo. This building would be located and designed to take care of the change in the hub traffic at a lesser rent expense.

The Curtiss Street lease can be terminated on thirty days' notice.

In distinct contrast to the Buffalo facility is the new Albany terminal constructed especially for the defendant by the Albany Port Authority. The annual rental is $63,000 and its capacity to handle up to 2400 pieces an hour indicates its suitability for efficient processing of modern traffic.

The negotiations for the Albany lease were begun late in 1967 by the defendant. Construction was started in June, 1968 and the company began to use this building early in December, 1968.

On January 21, 1969, Frank Leahy, a regional representative of the defendant, contacted William J. Head, General Chairman of the plaintiff, to inform him that the defendant intended to move the hub work from the Buffalo, New York, terminal to Albany, New York. At this first contact, Mr. Leahy explained the defendant's intention was to re-route the hub traffic to Albany, New York. Mr. Head responded that, in his opinion, Rule 12 of the agreement between the defendant and the union would apply in such a case, with certain benefits accruing to the employees who would be displaced in Buffalo but would have an opportunity to follow their work to Albany. Mr. Leahy responded that, because the defendant regarded this move as a re-routing, Rule 12 of the agreement would not apply.

On January 23, 1969, Mr. Head and Mr. Leahy, together with one representative from each side, again met, but their disagreement with respect to the applicability of Rule 12 persisted. On January 24, 1969, Mr. Leahy sent a letter confirming the substance of this latest meeting to Mr. Head, who received it on or about January 27. On January 31, 1969, further meetings between the respective parties were held with Mr. Head finally indicating that the union would seek relief in the courts. Correspondence between Mr. Head and Mr. Leahy on February 4 and 7 indicates that their basic disagreement lies in characterizing the move either a transfer or consolidation under Rule 12 of the agreement, or simply a re-routing. By letter dated February 12, 1969, Mr. Head notified the defendant that the plaintiff was exercising its prerogative in referring this dispute to the Railroad Adjustment Board for the Third Region.

Rule 12 of the agreement between the defendant and the Brotherhood of Railway and Steamship Clerks, Freight Handlers, Express and Station Employees— its interpretation—is the focal point of this dispute. The present agreement became effective on January 1, 1967 and was modified on December 14, 1968, but this modification did not affect Rule 12 in any way. A prior agreement between the parties, in effect since the late 1940's, covered basically the same material in its Rules 22 and 23 as is covered in the present Rule 12. The only exception is that Rule 12(e) was not contained in the earlier agreement.

Rule 12 provides in pertinent part:

"(a) This Agreement recognizes that two or more offices or departments may be consolidated and/or positions or work involving a position may be transferred from one seniority district to another after conference and agreement between the Management and the duly accredited representatives of the employes. In the event of failure to make an agreement within sixty (60) days after notice is given to the General Chairman or General Chairmen representing the employes to be affected by the contemplated change, the matter may be referred by either party to final and binding resolution in accordance with Sections 3 and/or 7 of the Railway Labor Act as amended. The issues submitted for such determination shall not include any question as to the right of the Company to make the change but shall be confined to the manner of implementing the contemplated change.

"(b) Employes may follow their positions or work when same is transferred from one seniority district to another. The incumbents will have

prior rights to the positions to be transferred, if they elect to accompany same. Those electing not to follow their positions and work may exercise their seniority rights and their positions will be bulletined first in the seniority district from which they are to be transferred, and if necessary, second in the seniority district to which they are to be transferred. Seniority of employes transferring under such circumstances shall be transferred to the district to which they are transferred.

\* \* \* \* \* \*

"(e) When a consolidation or transfer as provided in paragraph (a) requires an employe to change his residence such employe shall receive time off to make the transfer, transportation for themselves, dependent members of their family and personal property. They shall also receive a Five Hundred Dollar ($500) transfer allowance and be protected against loss in the sale of their homes or cancellation of leases."

Mr. Clement Lane, an Assistant Vice President who helped to negotiate the present union contract, defined a transfer of work under Rule 12 as a transfer of "identifiable work" which is exclusively the right of the employees in a certain city to perform. However, he stated that, when traffic not picked up or delivered at a certain city is routed to bypass that city, this is a "re-routing." The norm, he claims, is identifiability and whether or not the employees of a certain city have an exclusive right to perform this work.

Both sides agree that the Air Express, Import-Export and City Pick-up and Delivery are identifiable types of work and, if this work were moved from Buffalo, the Buffalo employees would be entitled to follow their jobs and, according to Rule 12, to claim work at the new location. The union contends that the hub work is also identifiable and, since all of the hub work is moved to Albany, the employees should be permitted to follow their jobs and put into effect the provisions of Rule 12.

The plaintiff agrees that the defendant has the right to transfer the work or re-route the traffic from Buffalo to Albany. The disagreement lies in the applicability of Rule 12. The plaintiff contends that, because Rule 12 applies to this change of work, the implementation of the change should be discussed by the parties for 60 days.

At the present time, there is a total of 441 jobs on the Buffalo roster. The roster includes men who are in supervisory work, on sick leave, furloughed employees and regular employees. It is estimated that the cutback in the work at Buffalo will drop from regular jobs all employees back to Roster #130, Irene Seggel, whose seniority date is December 12, 1944. There would not be regular work for any employee with the seniority date after that date. In addition to the 140 regular jobs abolished in Buffalo, the change will affect the work of at least 30 additional men.

After the move from Buffalo to Albany, 115 regular jobs remain in Buffalo. However, many senior men now working as clerks would be required to take jobs as drivers or platform employees. Because of their age or lack of experience in driving, they may not be able to hold a job as a platform worker or a driver and, therefore, their continued employment with the company will be endangered.

Testimony was received concerning individual hardship to particular employees. For example, Frank Laconti, 38 years of age, is Roster #258 with seniority to October 20, 1952, and the president of the Local Chapter of the Brotherhood. Before the transfer, he made $133 a week gross. He has two children, owns his own home, pays $135 a month on the mortgage, and has no seniority in any other district. He has worked as a driver on the city delivery for a number of years. He has a high school education and, if not permitted to follow the work to Albany, would not at

the present time have any other prospect of employment.[1]

The parties are in sharp disagreement as to how many new jobs at Albany will be needed to take care of the hub work moved from Buffalo. Mr. Leahy, the northeast manager, is of the opinion that there will be only a few new jobs available. Mr. Head, General Chairman of the plaintiff and familiar with both Buffalo and Albany operations, estimates that at least 100 additional men will be needed in Albany to take care of the hub work. The Albany manager of the defendant told his employees there that at least 70 new employees would be needed to take care of the hub work brought to Albany from Buffalo. Since the end of November, 1968, the defendant has hired a number of new men in Albany and is taking on applications for new positions.

There is a total of 186 employees on the Albany roster. The seniority date of many of them is quite recent, 40 in 1968, 13 in 1967, 6 in 1966 and 2 in 1955. If there is additional work in Albany and if the contention of the plaintiff is correct, there would be a substantial number of Buffalo employees who would be entitled to move to Albany.

The parties have agreed and this court finds that this is a minor dispute under the cases construing the Railway Labor Act. By letter dated February 12, 1969, plaintiff has referred this dispute to the National Railroad Adjustment Board.

■ The Board, not the Court, has the primary jurisdiction to settle the grievance or arbitrate the dispute between the parties. However, the court has the power to grant a preliminary injunction to maintain the status quo ante pending the outcome of a determination by the Adjustment Board. Railway Express Agency, Inc. v. Long Island City Lodge 2147, Brotherhood of Railway and Steamship Clerks, etc., 53 L.C. 17124 (S.D.N.Y.1966); Westchester Lodge 2186, etc. v. Railway Express Agency, Inc., 329 F.2d 748 (2d Cir. 1964).

The Supreme Court left this question open in Brotherhood of Locomotive Engineers v. Missouri-Kansas-Texas Railroad Co., 363 U.S. 528, 531, fn. 3, 80 S. Ct. 1326, 4 L.Ed.2d 1379 (1960). The respondent argues that the only occasions upon which district courts have granted status quo injunctions are in situations where there is an actual or a threatened strike. That may be. But to require the union to strike or threaten to strike before granting an injunction maintaining the status quo ante would encourage strikes. This is contrary to good sense and the purpose of the Railway Labor Act. 45 U.S.C. § 151 et seq. Westchester Lodge 2186, etc. v. Railway Express Agency, Inc., supra, 329 F.2d at 752.

■ The court recognizes that the equities must be carefully considered before such an injunction is granted. Westchester Lodge 2186, etc. v. Railway Express Agency, Inc., supra at 753. A status quo ante injunction for an indefinite time is not appropriate in this situation. The business of the defendant nationally and in the Buffalo area has fallen off sharply in the last few years. The shipments, revenues, and number of employees have all declined, especially since 1966. Based upon the evidence, the prospect is that this decline will continue. Defendant must consolidate offices for more efficient operation. The plaintiff does not argue with this.

Even if the plaintiff is correct in its interpretation of Rule 12(a)—that the

---

1. Mr. Laconti, like those other employees whose prospect of continued work with the defendant is dim, would be entitled to certain unemployment benefits. Under the Railroad Unemployment Insurance Act, employees entitled to benefits are paid $63.50 a week, which is nontaxable. Under Rule 13 of the contract, Supple-mental Unemployment benefits are paid by the defendant to employees with over two years of service. An employee with less than 10 years of service receives an additional $11.50 a week. Those with over 10 years' service receive $26.50 a week. These additional amounts are taxable, and are only paid for a limited time.

moving of hub work from Buffalo to Albany is a transfer of work described in that Rule and certain employees would be entitled to move from Buffalo to Albany with all the benefits of Rule 12(e), there would be no work for a large number of employees in the Albany office. The largest estimate was that there would be 100 additional jobs.

Eventually, to resolve this minor dispute, the Board will be called upon to interpret Rule 12(a). In addition to allowing transfers under certain circumstances, the Rule also requires that management and the Brotherhood discuss the implementation of transfers and, in the event of failure to agree after 60 days, the matter may be referred to arbitration.

The action of the defendant prevented discussion. The plaintiff first received notice on January 23, 1969 that the change would be effective February 15. Furthermore, because the company's position has been that Rule 12 does not apply, it has refused to talk to the plaintiff about implementation of the transfer.

The court concludes from the evidence that the change of the work in question was contemplated by the defendant for some time. The manager of the Albany office spoke of it early in December, 1968.

Both plaintiff's and defendant's representatives state that, in a Rule 12 situation, a 60-day period of discussion is helpful to resolve the differences between the parties.

Defendant contends that, if the plaintiff is right and Rule 12 applies, the rights of the employees can be safeguarded since the Board can order the company to pay back wages, etc. All agree that some decisions of the Board are long-delayed. If the Board should eventually find that some of the employees are entitled to transfer, that decision made some time from now would be of little practical help. A number of Buffalo employees would go to Albany if they had the opportunity. But by the time a Board decision is rendered, many of the employees would be engaged in other employment and the right to go to Albany would be an empty one.

 Therefore, a temporary injunction restoring the status quo before January 23, 1969 shall issue. This order shall be filed forthwith. However, in order to give the defendant adequate opportunity to make arrangements to transfer the hub work back to Buffalo, the defendant is given until March 7, 1969 to effectuate the re-transfer. This temporary injunction shall then remain in effect for a period of about sixty days, terminating on May 9, 1969.